# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF NORTH CAROLINA
# CHARLOTTE DIVISION
# DOCKET NO: 3:10-CR-9-FDW-DCK

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| v. ) | **MEMORANDUM AND** |
| ) | **RECOMMENDATION** |
| MICHAEL MAXWELL MACCONNELL, ) | |
| ) | |
| Defendant. ) | |
| ) | |

**THIS MATTER IS BEFORE THE COURT** on Defendant Michael Maxwell MacConnell's "Motion To Suppress Evidence (Evidentiary Hearing Requested)" (Document No. 7) filed on April 14, 2010. The United States filed its "Government's Response To Defendant's Motion To Suppress Evidence" (Document No. 9) on April 26, 2010 in opposition to Defendant's motion. An evidentiary hearing was held before the undersigned on May 27, 2010, with Defendant personally present with counsel. Having fully considered the briefs, testimony, evidence, and oral arguments, the undersigned will respectfully recommend that Defendant's motion be denied. The Court concludes the Defendant gave a lawful consent to the search of his home conducted by law enforcement.

## I. FACTUAL BACKGROUND

On January 19, 2010, a "Bill of Indictment" (Document No. 1) was returned charging the Defendant Michael Maxwell MacConnell ("Defendant" or "MacConnell") with knowingly and intentionally manufacturing and possessing with intent to distribute a controlled substance, that is, marijuana; and knowingly using and maintaining a place, that is, a residence located at 11116 Lawyers Road, Mint Hill, North Carolina, for the purpose of manufacturing a controlled substance, that is, marijuana, both violations of Title 21 of the United States Code. The factual basis for the

charges against the Defendant is the fruit of a search of the Defendant's home by law enforcement on October 28, 2009. That search, among other things, produced approximately 300 marijuana plants and United States currency. The Defendant, as stated above, moved to suppress this evidence.

The undersigned conducted a hearing on the motion to suppress on May 27, 2010, at which the government and the Defendant were represented by counsel. Both sides presented both evidence from the witness stand in the form of witnesses and argument to the Court on how the law should apply to these facts. Testimony presented through a law enforcement officer (for the government) and the Defendant himself (for the Defendant) was considerably at odds, and in the end, as set out below, the Court was called upon to make a credibility determination regarding the testimony to determine the facts of the matter.

Sergeant Jeff Grimes testified for the government in pertinent part as follows. Around 3:00 AM on October 27, 2009, Grimes was on routine patrol on NC Highway 51 in Mint Hill, North Carolina. The driver of a truck on the side of the road flagged him down to let him know there was a man lying down in front of the nearby police station who appeared to be bleeding. Grimes approached this man, who turned out to be the Defendant. The Defendant seemed confused, was bleeding from several lacerations to his head, and claimed he had been assaulted by four subjects in his nearby back yard. Grimes described the Defendant as somewhat confused and difficult to talk to, which he attributed to the apparent injuries.

Grimes called Medic to the scene, and the Defendant was treated there, though he declined a trip to the hospital, even though it was apparent he needed stitches. Grimes took the Defendant into a conference room just off the lobby of the nearby police station in order to get a statement from him. The Defendant was not handcuffed and was never under arrest; to the contrary, according to Grimes, the Defendant was treated as the victim of a crime. Only Grimes and the Defendant were

in the conference room, and the Defendant related to Grimes the details of the assault that had occurred in his back yard. Following his usual approach, Grimes wrote out a statement in the Defendant's own words, and the Defendant signed it. As Grimes put it, those were "his words that I put on the paper." On cross-examination, Grimes clarified that the statement the Defendant signed was actually the second one Grimes did; the first one he tore up and started anew.

In his written statement, the Defendant describes being approached by four male assailants in his back yard while he was hanging laundry. Describing the assault, the statement in its entirety reads as follows:

> On 10-27-2009 at approximately 0250 hrs. I was outside hanging laundry. I had taken several loads outside, as I was walking back to the side door (facing east) several individuals (4) approached from the woods behind my house. They began to yell "get on the ground, get on the ground." I started to run towards the house and 1 of the 4 individuals got in front of me and pointed what appeared to be a black automatic type handgun at my face. I immediately grabbed the gun and twisted it back towards his face, and we began to struggle. I felt many blows to my head at which time I let go of the gun and fell to the ground. They began telling me to get up and asking who else was inside the house. They instructed me to walk towards the house, as we got to the cedar tree beside the steps I picked up a shovel that was leaning up against the tree with this I began to lunge forward and swing towards them. This caused the 4 suspects to run towards the woods behind my house. One of the suspects turned and fired two rounds towards my direction. While they were running. I then ran toward Lawyers Road. I went to my neighbors house and was unable to get anyone to the door. I ran to the Police Dept. and was able to flag down a truck driver who in turn got me some help.
>
>     s Michael MacConnell

Exhibit H-1, Mint Hill Police Department, Victim/Witness Statement.


Grimes testified he was concerned for the Defendant's safety and therefore did not want the Defendant to return to his home without it being "cleared." Grimes noted particularly that the

assailants seemed interested in going in the house, which made his concern over "screening" the residence all the more pronounced. While initially resisting this suggestion, the Defendant ultimately agreed that only Grimes – and no one else – could search the house for this purpose. Grimes testified he never intimated he was going in the house whether the Defendant agreed or not; nor did Grimes make any statement to the Defendant that it was "policy" for the police to search a house under such circumstances. Grimes drove the Defendant the short distance to the house, and the two of them approached the house together.

As they approached a side door together, Grimes noticed that the main door was open, but the screen door was closed. Grimes noticed a strong smell of marijuana, even from the porch. As he entered, he described the smell of marijuana as "just about to knock you over – it was really strong." Once inside, Grimes observed, among other things, a bong pipe on a tray with apparent drug residue, numerous magazines addressing how to grow marijuana, and multiple stacks of mason jars. The Defendant discouraged Grimes from searching one particular room, saying he had already looked and found no one in there. The Defendant at some point after these items had been observed by Grimes said "aren't we about done here," and the search concluded shortly thereafter.

The following day, October 28, 2009, Grimes prepared a search warrant application, which included an affidavit setting out the factual basis for probable cause to search the Defendant's home. Grimes explained that his experience with preparing search warrant affidavits was limited. The affidavit included some, though not all, of the facts set out above. The search warrant was issued, and other officers conducted that search (not Sergeant Grimes), which yielded, among other things, approximately three hundred growing marijuana plants and a significant amount of United States currency.

The defense presented the testimony of the Defendant, Michael MacConnell, whose version of the events diverged from that of Grimes in material respects. The Defendant testified that he was accosted in his back yard at around 3:00 AM by four subjects. The men "pistol-whipped" the Defendant two separate times within a short period, and they marched the Defendant in the direction of his house. The Defendant testified that he resisted, yelling for the police and grabbing a shovel and trying to stab the assailants in a "sword-fighting move." The men fled, firing two shots as they retreated, got into a nearby car, and drove off. The Defendant ran first to two neighbors' homes, where he could not rouse anyone, and then to the nearby police station. Shovel still in hand, he waved his arms at passing traffic, finally getting the attention of a truck driver.

The Defendant claims that when he met Grimes, Grimes was very forceful, and the Defendant felt "very threatened" when Grimes asked him to put the shovel down. The Defendant acknowledged being treated by Medic, but declining to be taken to the hospital. The Defendant talked to Grimes about the assault incident, first outside, and then in what he described as a "closed interrogation room" in the lobby of the police station. The Defendant described Grimes as very "adamant" about searching his house and claimed the Sergeant gave him a choice between consenting to the search and being placed in the back of a police car while the search was conducted even without his consent. The Defendant described himself as having "relented" to having Grimes only come to the house, but did so "only under extreme duress."

The Defendant stated he was unhappy with both of the written statements prepared by Grimes, not just the first one, which was torn up. He described himself as having signed it in "disgust" and did so just so he could get back to his house to wash the blood off himself. At one point during his testimony, the Defendant claimed that the local police have a reputation for "terrorizing the local citizenry." The Defendant complained that the local police, Grimes included,

did not seem interested in solving the assault case and specifically mentioned the lack of follow-up on his request that police come by to pick up black plastic bags he believed the assailants had left in the back yard of his home during the assault.

The Defendant acknowledged on cross-examination that the four subjects who assaulted him stated their intention to get inside his home and attempted by their actions to in fact get inside his home. He stated that he was never handcuffed when he was talking to Grimes in the conference room, which had a window, and that Grimes never intimated he had committed any crime. Grimes in fact wrote out a second statement after tearing up the first, which the Defendant signed.

As addressed below in detail, the issue presented by these facts is of course whether the Defendant gave knowing and voluntary consent to Sergeant Grimes' search of his home. The testimony of the witnesses is at odds, and the Court is therefore called upon to determine the credibility of the witnesses.

## II. DISCUSSION

The parties' contentions in this matter are as one might predict. The government essentially argues that Sergeant Grimes' testimony is credible and establishes that the Defendant gave a knowing and voluntary oral consent to Grimes' search of his home to see if it was clear of any assailants from the assault incident. The government argues that this oral consent was given to Grimes during the time Grimes was taking the Defendant's statement (as a victim of the assault) in the police station conference room. Given that the consent was valid, the government argues, the search warrant application based in part on what Grimes saw during the consent search was validly issued and the fruit of that second search – including approximately three hundred marijuana plants and United States currency – is admissible.

The Defendant claims in essence that he was coerced into giving his consent, and therefore, the consent was not voluntary and invalid. As stated above, this position springs from the Defendant's version of the facts, which if believed, suggests that the Defendant really had little choice. The Defendant testified that he was given the choice of consenting to the search or sitting in the back seat of the police car while the police conducted the search anyway. Citing <u>Schneckloth v. Bustamonte</u>, 412 U.S. 218 (1973) and <u>Bumper v. North Carolina</u>, 391 U.S. 543 (1968), the Defendant argues that showing no more than acquiescence to a claim of lawful authority, which the Defendant claims is what occurred here, does not constitute a voluntary consent.

The legal basics of lawful searches based on consent are familiar. A person's right to be free from unreasonable searches and seizures arises from the Fourth Amendment to the United States Constitution, which specifically provides:

> The right of people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Constitution, Amend. IV. However, a search conducted pursuant to a valid consent is a well-recognized exception to the Fourth Amendment's general warrant requirement. <u>Schneckcloth</u>, 412 U.S. at 219. When a search based on consent is challenged, the court must determine, based upon the "totality of the circumstances" whether consent was knowing and voluntary, which the government must prove by a preponderance of the evidence. <u>See, e.g.</u>, <u>United States v. Mendenhall</u>, 446 U.S. 544, 557 (1980); <u>United States. v. Buckner</u>, 473 F.3d 551, 553-55 (4th Cir. 2007), <u>cert. denied</u>, 550 U.S. 913 (2007). It is true that consent must be more than mere acquiescence to apparently lawful authority. <u>Bumper</u>, 391 U.S. at 548-49 (no consent to search if only acquiescence to apparently lawful authority).

In this case, the evidence on some the facts material to a determination of whether the consent to search was valid is in conflict. As set forth above, the government's witness, Sergeant Grimes, testified that the Defendant gave a voluntary oral consent to the search of his house by Grimes during the time they were talking in the police station conference room. On the contrary, the Defendant testified that he was given no true choice – he had to choose between consenting to the search and sitting in the back of a police car while police conducted the search anyway. "[I]t is the role of the district court to observe witnesses and weigh their credibility during a pretrial motion to suppress." United States v. Murray, 65 F.3d 1161, 1169 (4th Cir. 1995); United States v. Abu Ali, 528 F.3d 210, 232 (4th Cir. 2008).

The undersigned, having listened to the testimony live, and having reviewed it again on a recording prior to the preparation of this order, finds the testimony of Sergeant Grimes more credible than that of the Defendant. In the opinion of the undersigned, the testimony of Grimes had the appearance and ring of truth to it. His demeanor was calm and courteous. Now a private citizen, Grimes had little to gain by doing anything other than telling the truth. Grimes admitted on cross-examination that he had little experience with search warrant affidavits and had left some facts out of that document. These concessions suggested an honest officer of limited experience, not an officer who was attempting in any way to shade the truth. The way Grimes dealt with questions about his decisions while investigating the case and what he might have done differently made him seem more credible, not less.

The Defendant's testimony, on the other hand, was less credible. In contrast to Grimes, the Defendant was an interested witness who had a lot at stake. The Defendant faces two serious drug felonies based upon the evidence seized from the house, where after all, the Defendant lived alone. The evidence the Defendant seeks to suppress, if admitted, is damning. Moreover, if convicted, the

totality of the record in the case suggests the Defendant may have a prior drug felony conviction, which might serve to further enhance the Defendant's sentence. The Defendant's demeanor and tone, in contrast to Grimes, at times suggested exaggeration and hyperbole, as evidenced for example by his volunteering that the local police have a reputation for "terrorizing the local citizenry." The Defendant was simply less believable.

In short, therefore, the undersigned credits the testimony of Sergeant Grimes and discounts the testimony of the Defendant. The Court concludes that the Defendant, then being treated as the victim of an assault, gave a lawful oral consent to having Grimes search his house to ensure there were not intruders remaining. Once lawfully on the premises, though not there investigating the Defendant, Grimes made the observations of obvious contraband which then formed the basis of his search warrant affidavit. The search based on that affidavit located the marijuana plants and the United States currency that form the basis of this case, and those items should not be suppressed. The Defendant's motion should be denied.

### III.  RECOMMENDATION

**IT IS, THEREFORE, RECOMMENDED,** for the foregoing reasons, that Defendant Michael Maxwell MacConnell's "Motion To Suppress Evidence (Evidentiary Hearing Requested)" (Document No. 7) be **DENIED**.

### IV.  NOTICE OF APPEAL RIGHTS

The parties are hereby advised that, pursuant to 28 U.S.C. § 636(b)(1)(C) and Rule 72 of the Federal Rules of Civil Procedure, written objections to the proposed findings of fact, conclusions of law, and recommendation contained herein must be filed within fourteen (14) days of service of same.  Page v. Lee, 337 F.3d 411, 416 n. 3 (4th Cir.2003); Snyder v. Ridenour, 889 F.2d 1363, 1365 (4th Cir.1989); United States v. Rice, 741 F.Supp. 101, 102 (W.D.N.C. 1990).  Failure to file

objections to this Memorandum and Recommendation with the District Court constitutes a waiver of the right to *de novo* review by the District Court. Diamond v. Colonial Life, 416 F.3d 310, 315-16 (4th Cir.2005); Wells v. Shriners Hosp., 109 F.3d 198, 201 (4th Cir.1997); Snyder, 889 F.2d at 1365. Moreover, failure to file timely objections will preclude the parties from raising such objections on appeal. Thomas v. Arn, 474 U.S. 140 (1985), reh'g denied, 474 U.S. 1111 (1986); United States v. Schronce, 727 F.2d 91 (4th Cir.), cert. denied, 467 U.S. 1208 (1984).

The Clerk is directed to send copies of this Memorandum and Recommendation to counsel for the parties and the Honorable Frank D. Whitney.

**IT IS SO RECOMMENDED**.

Signed: June 11, 2010

David C. Keesler
United States Magistrate Judge